**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**DONNA CLARK,**

                              **Plaintiff,**               **1:09-cv-716**
                                                          **(GLS/CFH)**

        **v.**

**NEW YORK STATE OFFICE OF**
**THE STATE COMPTROLLER**
**et al.,**

                              **Defendants.**

_____

**APPEARANCES:**                         **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Donna Clark
Pro Se
43 Raymo Street
Albany, NY 12209

**FOR THE DEFENDANTS:**
*New York State Office of the State*
*Comptroller, Jeanine Dominique,*
*Paul Moller, James Normile, Gary*
*Degener, Robert McCauslin,*
*Thomas DiNapoli, Ceilia Gonzalez,*
*Melanie MacPherson,*
HON. ERIC T. SCHNEIDERMAN          KELLY L. MUNKWITZ
New York State Attorney General     Assistant Attorney General
The Capitol
Albany, NY 12224

*John Wapner*
Furman, Kornfeld Law Firm           KATHRYN C. COLLINS, ESQ.
61 Broadway, 26th Floor             NEIL S. KORNFELD, ESQ.

New York, NY 10006

*Civil Services Employees Association,*
*Mark Unser, Denise Lawyer, Daniel*
*Donahue*
Civil Service Employees Association,     DAREN J. RYLEWICZ, ESQ.
Inc.
143 Washington Avenue
P.O. Box 7125, Capitol Station
Albany, NY 12224

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

## I.  Introduction

Plaintiff *pro se* Donna Clark commenced this action against

defendants,[1] asserting claims pursuant to the Family and Medical Leave

Act (FMLA),[2] Title VII of the Civil Rights Act,[3] Titles I and V of the

Americans with Disabilities Act (ADA),[4] 42 U.S.C. §§ 1983 and 1985 for

---

[1] Defendants include the New York State Office of the State Comptroller (OSC), Jeanine Dominique, Paul Moller, James Normile, Gary Degener, Robert McCauslin, Thomas DiNapoli, Celia Gonzalez, and Melanie MacPherson (collectively, the "State defendants"); Mark Unser, Denise Lawyer, Daniel Donahue, and the Civil Service Employees Association (CSEA, and collectively, the "Union defendants"); and John Wapner.

[2] *See* 29 U.S.C. §§ 2601-2654.

[3] *See* 42 U.S.C. §§ 2000e-2000e-17.

[4] *See* 42 U.S.C. §§ 12201-12213.

alleged violations of the First, Fourth,[5] and Fourteenth Amendments of the

United States Constitution, the New York State Human Rights Law

(NYSHRL),[6] and the Age Discrimination in Employment Act (ADEA).[7]

(Compl., Dkt. No. 1.)  Pending are defendants' motions for summary

judgment, (Dkt. Nos. 141, 145, 151), and Clark's motions for sanctions,

(Dkt. Nos. 142, 143).  For the reasons that follow, defendants' motions are

granted and Clark's motions are denied.

## II. **Background**[8]

_____

[5] Clark's Fourth Amendment claim appears to be brought only against Wapner. (Compl. ¶¶ 128, 155.)

[6] *See* N.Y. Exec. Law §§ 290-301.

[7] *See* 29 U.S.C. §§ 621-634.

[8] Defendants submitted statements of material facts in support of their motions for summary judgment. (Dkt. No. 141, Attach. 2; Dkt. No. 145, Attach. 36; Dkt. No. 151, Attach. 1.) While Clark responded, (Dkt. Nos. 167, 183, 183 at 21-22), she did not do so in compliance with Local Rule 7.1(a)(3).  For instance, many of Clark's denials do not, as Rule 7.3 requires, set forth a specific citation to the record where the factual issue arises, but instead accompany an instruction to "see record evidence" or "see total record evidence," contain no citation whatsoever, or generally cite an entire document—often, an entire deposition transcript.  (*See, e.g.*, Dkt. No. 167 ¶¶ 5-6, 9-10, 12, 18, 39, 43, 45, 47; Dkt. No. 183 ¶¶ 17, 21, 41, 42, 44, 51, 53, 58, 62-66; Dkt. No. 183 at 21-22 ¶¶ 1-2.)  Moreover, Clark failed to respond to the entirety of the Union defendants' statement of material fact because she was "simply out of time," (Dkt. No. 167 at 16), despite being granted four extensions of time to file her response to defendants' motions, (Dkt. Nos. 150, 158, 174, 180).  Further, in support of her response, Clark filed thousands of pages of exhibits, spanning over twenty docket entries, (Dkt. Nos. 162-67, 169-72, 175, 178, 181-88), in no particular order and with titles such as "Exhibit(s) Zonderman made me sick," (Dkt. No. 162, Attach. 7), and "Exhibit(s) Unser talking about Kent attack against Clark then he said, he wasn't there," (Dkt. No. 170, Attach. 3).  Thus, though cognizant of the special solicitude afforded to *pro se* plaintiffs, the court notes that Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."  *Amnesty Am. v. Town of*

## A.    Factual History

Clark, a half Sicilian, Christian woman over forty years of age, was employed by the Office of the New York State Comptroller (OSC) as a Calculation Clerk I from June 30, 2005 to March 1, 2007.  (Union Defs.' Statement of Material Facts (SMF) ¶¶ 1, 2, Dkt. No. 141, Attach. 2; State Defs.' SMF ¶ 1, Dkt. No. 145, Attach. 36.)  Her job duties generally included delivering mail, sorting through documents, working on the computer, ordering and delivering folders, maintaining lists, searching for folders, and distributing work to supervisors.  (Compl. ¶ 29.)  She also was a member of CSEA.[9]  (Union Defs.' SMF ¶ 34.)  Clark allegedly suffers from several maladies, including post-traumatic stress syndrome, chronic

---

*W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002); *see Arroyo–Horne v. City of N.Y.*, No. 07 CV 5213, 2011 WL 864682, at *4 n.3 (E.D.N.Y. Mar. 9, 2011) (noting that a court must "construe[] [a *pro se* plaintiff's] claims liberally," but also that it is not under an obligation to "scour the record to assess whether a genuine issue of material fact exists" (citations omitted)).  Nevertheless, the court has thoroughly reviewed the record and considered Clark's disputed facts.  In the absence of a clear citation to the record, however, the court has deemed admitted defendants' statements of material facts to the extent that they are properly supported.

[9] It is clear from the record that Clark's relationships with CSEA Local 652 president, Unser, and CSEA Local 652's Labor Relation Specialist (LRS), Lawyer, were strained, at best.  (Union Defs.' SMF ¶¶ 26, 32.)  In her opposition, Clark refers to Unser as "a sociopathic, power-hungry, abuser."  (Dkt. No. 189 at 4.)  Unser was also an employee of OSC and had expressed concern to management about Clark's behavior.  (Union Defs.' SMF ¶ 27; Dkt. No. 145, Attach. 16 ¶ 6.)  In February 2007, Clark sought to file a complaint against Unser, and also accused Lawyer of having a conflict of interest and being unable to represent Clark.  (*Id.* ¶¶ 32-36.)

pain, amnestic disorder due to trauma, post-concussive syndrome, cognitive deficits, photophobia, hip and lumbar injuries, headaches, word retrieval problems, and tangential speech patterns.  (Compl. ¶ 23; State Defs.' SMF ¶ 5.)  Medical evidence in the record also indicates that Clark has a diagnosis and history of "schizoaffective disorder."[10]  (Dkt. No. 141, Attach. 4 at 40, 42, 47, 48.)

    1.   *Accommodations Requests*

At three different points during her employment, Clark requested certain accommodations.  First, in 2005, following an incident in which she was assaulted and robbed near the OSC building, Clark requested parking privileges in the garage.  (State Defs.' SMF ¶¶ 6, 9.)  She was granted garage parking privileges, but they were intended to be short-term.  (*Id.* ¶ 10; Dkt. No. 145, Attach. 18 ¶ 3.a.; Dkt. No. 145, Attach. 19 at 1.)  At the end of July 2006, Clark was advised that she needed to make other parking arrangements by the end of August.  (Dkt. No. 145, Attach. 19 at 1.)  She then submitted a request for disability parking, but after the OSC nurse asked Clark to provide her with documentation of her PTSD and

---

[10] The court notes that Clark disputes both the diagnosis and its relevance to this litigation.  (Dkt. No. 167 ¶ 5.)

agoraphobia, Clark refused to do so, and in October 2006, Clark was denied medical parking.  (*Id.* at 2-5.)

Second, in December 2006, Clark requested a soft chair due to spinal injuries.  (Dkt. No. 145, Attach. 21 at 2.)  Although the nurse responded to Clark's request and asked that Clark provide medical documentation, Clark first responded that she was "all set," and then later provided a note from her doctor, but ultimately declined to fill out the reasonable accommodation request.  (State Defs.' SMF ¶¶ 27-29; Dkt. No. 145, Attach. 21 at 3, 5-6.)  Third, in January 2007, Clark complained that the light above her work station was too bright and requested a filter.  (Dkt. No. 145, Attach. 18 ¶ 3.d.)  A workstation assessment was completed, and the nurse directed that the light be changed and a filter added.  (*Id.*; Dkt. No. 145, Attach. 22 at 1-4.)  In her complaint, Clark claims that, instead of a light cover, bright pink light lamps were installed, causing her to sustain "burns to [her] face, eyes, and chest area and permanent visision loss," because she believed that the lamps were "Germicidal Light Lamps," which emit radiation and "are not meant to be placed directly over a human being[] for exposure."  (Compl. ¶¶ 44-49.)

## 2. FMLA Leave and Subsequent Events

Clark went on approved FMLA leave from October 26, 2006 through December 3, 2006. (State Defs.' SMF ¶ 20; Dkt. No. 145, Attach. 34 at 21.) In her deposition, Clark explained that she went on FMLA leave because she had not been feeling well, was extremely tired, was having constant nightmares and panic attacks, and was traumatized by "a gentleman that seemed to arrive each morning at the same time [she] did." (Dkt. No. 145, Attach. 34 at 19-20.) Prior to Clark's FMLA leave, a pilot program was implemented in another section of the bureau, by which clerks would no longer deliver folders; when Clark went on FMLA leave, OSC decided to pilot that program in her section.[11] (State Defs.' SMF ¶¶ 24-26.) Clark claims that when she returned from FMLA leave, some of her job duties, which included ordering and delivering folders, were eliminated. (Dkt. No. 145, Attach. 34 at 51.)

Not long after Clark returned from her FMLA leave, several of her coworkers began lodging complaints about her increasingly strange and disruptive behavior, which continued despite her supervisors meeting with

---

[11] Although Clark purports to deny this, she predominately disputes which section of the bureau the program was piloted in prior to her FMLA leave. (Dkt. No. 183 ¶¶ 24-25.)

her to discuss appropriate office behavior. (State Defs.' SMF ¶¶ 30, 36, 39.) Some of the complaints included that Clark screamed profanities over the telephone, was sending personal information about her coworkers by email to her home, and would eavesdrop on their conversations, take what was said out of context, and then complain about it. (*Id.* ¶¶ 40, 42, 44; Dkt. No. 145, Attach. 16 ¶¶ 11(b), 11(c), 11(g).)

During this time, Clark alleges that her coworker, defendant Paul Moller, "while engaged in conversation said loud enough for [her] to hear, as [she] sat in [her] cubicle, . . . 'All Italians are stupid.'" (Compl. ¶ 67; Dkt. No. 145, Attach. 34 at 63-64.) Clark claims that she advised defendant Robert McCauslin, a manager, about Moller's ethnic slurs. (Compl. ¶ 71; State Defs.' SMF ¶ 51.) After reporting the slurs to McCauslin, Clark claims that she witnessed McCauslin and Moller laughing, and gesturing "'F*** Y**,'" in Italian." (Compl. ¶¶ 73-74; Dkt. No. 145, Attach. 34 at 63-64; State Defs.' SMF ¶¶ 52-53.) McCauslin and another manager, David Burmaster, then met with Clark and discussed the incident, at which meeting Burmaster explained that Moller's wife was Italian. (Compl. ¶¶ 76-78; State Defs.' SMF ¶ 51.) After this incident, an email was circulated to employees advising them of the importance of

8

being considerate and respectful of their colleagues' pride in their heritage. (Dkt. No. 145, Attach. 17 ¶ 23.)

Between December 2006 and February 2007, Clark's supervisors met with human resources on several occasions to discuss how to manage Clark's increasingly disruptive behavior. (State Defs.' SMF ¶ 47.) On February 26, 2007, Mary Kent, one of Clark's coworkers, screamed at Clark, who was standing next to Kent's cubicle, "'You are a f**king nut. . . . You are scaring people. You are a nut.'" (*Id.* ¶¶ 49-50.) Soon thereafter, Clark met with defendant Jeanine Dominique, the Assistant Director of Labor Relations within OSC's Division of Human Resources and Administration, during which meeting Dominique grew concerned with Clark's erratic demeanor. (*Id.* ¶ 48; Dkt. No. 145, Attach. 16 ¶ 2.)

### 3. *Involuntary Leave*

After her meeting with Clark, Dominique met with management, including defendant Melanie MacPherson (Whinnery), defendant James Normile, McCauslin, Burmaster, and defendant Gary Degener. (State Defs.' SMF ¶ 52.) At that meeting, management noted that many of Clark's co-workers had expressed concern with her behavior, and suggested that Dominique meet with them separately. (*Id.*) Dominique

9

then met separately with several of Clark's coworkers, including, among others, Moller, Unser, and Kent; Dominique was struck by the consistency in their stories and in their fear of Clark.  (*Id.* ¶¶ 52-53.)  On February 28, 2007, Normile, Whinnery, a member of the OSC Legal department, and Dominique then determined that Clark would be placed on involuntary leave pursuant to § 72.5 of the Civil Service Law[12] due to her increasingly troubling behavior and the seemingly genuine fear among her coworkers. (*Id.* ¶ 54; Dkt. No. 145, Attach. 16 ¶ 14.)  Clark was then provided with notice of her leave.  (State Defs.' SMF ¶ 55.)

On March 12, 2007, Dominique wrote to the Department of Civil Service's Employee Health Services (EHS) and requested that Clark be evaluated to determine if any physical or mental conditions prevented her from performing her job duties.  (Dkt. No. 145, Attach. 5; Dkt. No. 145,

_____

[12] Section 72.5 of the Civil Service Law states, in pertinent part:

When in the judgment of an appointing authority an employee is unable to perform the duties of his or her position by reason of a disability . . . the appointing authority may require such employee to undergo a medical examination to be conducted by a medical officer selected by the civil service department or municipal commission having jurisdiction.

If, upon such medical examination, such medical officer shall certify that such employee is not physically or mentally fit to perform the duties of his or her position, the appointing authority shall notify such employee that he or she may be placed on leave of absence.

Attach. 16 ¶ 16.)  In her letter, Dominique provided EHS with a list of

troubling behavior that Clark exhibited.  (Dkt. No. 145, Attach. 5 at 1-3.)

Clark was provided copies of the letter and informed that her evaluation

was scheduled for March 21, 2007.  (Dkt. No. 145, Attach. 6; Dkt. No. 145,

Attach. 16 ¶ 16.)  Clark was evaluated by the EHS psychological

consultant, defendant Dr. John Wapner, and EHS psychiatric consultant,

Dr. Marcos Nieves. (Dkt. No. 145, Attach. 7.)  Wapner then provided EHS

with a report regarding his findings, which concluded that Clark "seems

pre-occupied with her co-workers and would be unable to focus on her

work" and that she "is unable to perform her job duties."  (Dkt. No. 151,

Attach. 4 at 4.)  EHS's Medical Director, Dr. Richard Ciulla, then wrote to

OSC and informed it that EHS determined that Clark was unfit to perform

the essential duties of her job.  (Dkt. No. 145, Attach. 7.)  By letter dated

April 16, 2007, Clark was informed of EHS's determination, and Clark

appealed.[13]  (State Defs.' SMF ¶ 58; Dkt. No. 145, Attach. 8.)

### 4.    Section 72 Hearing

Clark's § 72 hearing began on January 10, 2008 and continued over

---

[13] Pursuant to § 72.5 of the Civil Service Law, an employee is allowed ten working days to object to the imposition of involuntary leave and to request a hearing.

seventeen days throughout 2008.[14]  (Dkt. No. 145, Attach. 18 ¶ 4.)  On the last day of the hearing, while cross-examining an EHS doctor, Clark repeatedly announced "[i]t's over" and "[y]ou're bought, Zonderman."[15] (Dkt. No. 145, Attach. 30 at 3-4.)  Despite additional days remaining in the hearing schedule, OSC moved to have the hearing officially closed due to Clark's refusal to proceed; the hearing officer granted that motion.  (Dkt. No. 145, Attach. 30.)

Additional briefs were submitted by the parties, and ultimately, in a thirty-five-page decision, the hearing officer found that OSC had probable cause to believe that Clark's continued presence on the job represented a potential danger to persons or property or would severely interfere with operations when it placed her on involuntary leave.  (Dkt. No. 145, Attach.

---

[14] CSEA did not represent Clark in the hearing.  (Union Defs.' SMF ¶¶ 38-39.)  Once she was placed on involuntary leave, Clark contacted LRS Rich Blair and informed him that she was going to appeal the decision to place her on involuntary leave.  (*Id.* ¶ 38; Dkt. No. 141, Attach. 6 at 3 ¶ 5.)  Blair stated that, in order for Clark to obtain CSEA Legal Department representation, Clark would need to forward all relevant information to Blair.  (Dkt. No. 141, Attach. 6 at 3 ¶ 5; Dkt. No. 141, Attach. 6 at 7.)  Blair, however, never received any information from Clark.  (Dkt. No. 141, Attach. 6 at 3 ¶¶ 6-7; Dkt. No. 141, Attach. 6 at 7.)  Nevertheless, CSEA then-Deputy Counsel Steven Crain, emailed Clark and advised her to send him the relevant information for her appeal, including medical documentation.  (Dkt. No. 141, Attach. 6 at 13.)  Despite CSEA's attempts, Clark never sent any documentation, refused to cooperate, and was generally combative in her email communications.  (*Id.* at 9-13.)

[15] Paul Zonderman was the hearing officer for Clark's § 72 hearing.  (Union Defs.' SMF ¶ 16.)

31 at 35.)  The hearing officer further found that Clark was physically and mentally unfit to perform her duties when she was placed on involuntary leave, and recommended that Clark remain on involuntary leave pursuant to § 72.1 of the Civil Service Law.  (*Id.*)  By Final Determination, dated June 4, 2009, OSC notified Clark that it was adopting the hearing officer's findings and recommendations.  (Dkt. No. 141, Attach. 5 at 72-73.)

## B.  Procedural History

On or about December 3, 2007, Clark filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).  (Compl. ¶ 4; Dkt. No. 141, Attach. 4 at 29-30.)  In April 2009, after closing its case, the EEOC issued right-to-sue letters to Clark notifying her of the right to file a civil action under Title VII.  (Dkt. No. 1 at 28-31.)  Consequently, on June 23, 2009, Clark commenced this action against defendants.[16]  Soon thereafter, all defendants filed motions to dismiss.  (Dkt. Nos. 26, 30, 36.)  With respect to the State defendants, the court granted the motion as to Clark's Title VII claims against the individual State defendants and Clark's

---

[16] After filing the present action, Clark commenced another action in this court on June 23, 2009, in which she asserted substantially the same claims that she asserts here.  *See Clark v. Dominique*, No. 1:10-cv-1073.  In that case, all of Clark's claims were dismissed.  *See Clark v. Dominque*, 798 F. Supp. 2d 390 (N.D.N.Y. 2011).

ADEA claim, but denied the motion with respect to the remaining claims. (Dkt. No. 53 at 5-7.) With respect to Wapner, the court dismissed all of Clark's claims, except for her § 1983 claims. (*Id.* at 6-7.) Finally, the court denied the Union defendants' motion in its entirety. (*Id.* at 6-8.)

### III. <u>Standard of Review</u>

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV. <u>Discussion</u>[17]

### A. <u>State Defendants</u>

Remaining against the State defendants are Clark's claims under the ADA, Title VII, FMLA, § 1983 for violations of her First and Fourteenth Amendment rights, and NYSHRL.

---

[17] The court notes that Clark's virtually incomprehensible memorandum of law is forty-two pages in length, directly in contravention of of L.R. 7.1(a)(1), which limits memoranda of law to twenty-five pages, absent court approval. (Dkt. No. 189.)

*1.     ADA*

Clark asserts claims pursuant to Titles I and V of the ADA.  (Compl. ¶ 1.)  As an initial matter, the State defendants argue that all ADA claims asserted against the individual defendants must be dismissed because the ADA does not provide for individual liability, as it only authorizes "employer" liability.  (Dkt. No. 145, Attach. 37 at 10.)  The court concurs, and Clark's ADA claims against the individual State defendants are dismissed.  *See Herzog v. McLane Northeast, Inc.*, 999 F. Supp. 274, 277 (N.D.N.Y. 1998).

The State defendants also argue, as an initial matter, that Clark's claims pursuant to Title I of the ADA must be dismissed against OSC because OSC, as an arm of the state, is entitled to Eleventh Amendment immunity.  (Dkt. No. 145, Attach. 37 at 10.)  As the Supreme Court has spoken definitively on this issue, the court agrees.  *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 368-74 (2001) (holding that Congress did not validly abrogate the states' Eleventh Amendment immunity for Title I claims seeking monetary damages); *see also Shepherd v. N.Y.S., Office of Mental Health*, No. 10CV837A, 2013 WL 636178, at *4 (W.D.N.Y. Jan. 29, 2013).

The State defendants, however, misconstrue Clark's claim under Title V of the ADA as a claim pursuant to § 504 of the Rehabilitation Act. (Dkt. No. 145, Attach. 37 at 10-13.)  Clark's complaint clearly cites "Title V, Section 503 of the Act, 42 U.S.C. 12203," which is the anti-retaliation provision of the ADA.  (Compl. ¶ 1.)  The court assumes the State defendants' construction of this claim was in error.  Despite this error, the State defendants' argument that they are entitled to Eleventh Amendment immunity with respect to Clark's Title I claim applies with equal force to Clark's Title V claim.  Indeed, several district courts in this Circuit have held that sovereign immunity also applies to retaliation claims brought under Title V of the ADA.  *See, e.g.*, *Johnson v. N.Y.S. Dep't. of Corr. Servs.*, No. 11-CV-079S, 2012 WL 4033485, at *4 (W.D.N.Y. Sept. 12, 2012) (noting that, if "'a state is immune from underlying discrimination, then it follows that the state must be immune from claims alleging retaliation for protesting against discrimination'" (quoting *Chiesa v. N.Y.S. Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009)); *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 408 (E.D.N.Y. 2010) ("Sovereign immunity also extends to claims of retaliation brought pursuant to Title V of the ADA."). The court is persuaded by the reasoning of those decisions, and,

16

accordingly, dismisses Clark's Title V claim against OSC.

2.    *Title VII*

Clark's Title VII claim against OSC is based on "[t]he acts of the

defendants in discriminating against [her] because of her religion, sex, age,

and national origin and ethnicity."  (Compl. ¶ 184.)  Although OSC admits

that the nature of Clark's Title VII claim is unclear, it construes it as one

alleging a hostile work environment,[18] and argues that it is entitled to

summary judgment on this claim because the offensive comments

allegedly made are insufficiently severe or pervasive to reach the level of a

hostile work environment.  (Dkt. No. 145, Attach. 37 at 14-16.)

Where a discrimination claim is predicated on the existence of a

hostile work environment, the plaintiff must demonstrate that the conduct in

question: "(1) is objectively severe or pervasive—that is, creates an

environment that a reasonable person would find hostile or abusive; (2)

creates an environment that the plaintiff subjectively perceives as hostile or

abusive; and (3) creates such an environment because of the plaintiff's . . .

---

[18] Indeed, in her complaint, Clark notes that working at OSC was a "hostile work environment."  (*Id.* ¶ 78.)  In her deposition, Clark also expressed confusion about her Title VII claim.  (Dkt. No. 145, Attach. 34 at 204-05.)  She also admits that the facts she claims establish her Title VII claim are virtually identical to the facts she claims support her FMLA claim.  (*Id.*)

protected characteristic." *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (internal quotation marks omitted).  In determining whether a hostile work environment claim has been established, "courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (internal quotation marks and citation omitted).

In support of her Title VII claim, Clark primarily argues that she was the victim of ethnic slurs in the workplace.  For example, Clark claims that, "[i]n January 2007 . . . Moller, a coworker and union member stated . . . to me, 'All Italians are stupid.'"  (Compl. ¶ 64; Dkt. No. 145, Attach. 34 at 63-64.)  She further claims that, "[o]n several occasions . . . Moller posted demeaning signs addressed to and directed at me, over a basket where I delivered mail.  A sign stating: 'How stupid can <u>you</u> get,' was once placed there.  Other signs included, 'What's it all about Alfie???'"  (Compl. ¶ 66; Dkt. No. 145, Attach. 34 at 62-63; Dkt. No. 189 at 1-2.)  Clark also alleges that, "[o]n February 1, 2007, . . . Moller while engaged in conversation said

loud enough for me to hear, as I sat in my cubicle, 'What do you expect? All Italians are stupid.'" (Compl. ¶ 67; Dkt. No. 145, Attach. 34 at 63-64.) After reporting the slurs, Clark claims that she witnessed McCauslin and Moller laughing, and gesturing "'F*** Y**'", in Italian." (*Id.* Compl. ¶¶ 73-74; Dkt. No. 145, Attach. 34 at 63-64.) After this incident, an email was circulated to employees advising them of the importance of being considerate and respectful of their colleagues' pride in their heritage. (Dkt. No. 145, Attach. 7 ¶ 23.) After reviewing the record, the court is not satisfied that these two isolated incidents of ethnic slurs rise to the level of a severe and pervasive hostile work environment based on Clark's ethnicity, or any other protected characteristic.

Aside from the incidents of "ethnic slurs," Clark only alleges a series of events that she claims constitute "harassment," including a 2007 incident in which Mary Kent screamed obscenities at her and repeatedly called her a "nut." (Compl. ¶ 93; Dkt. No. 189 at 2, 7, 13, 15.) The other incidents of harassment of which Clark complains simply are not related to a protected characteristic, and therefore do not satisfy the third element required to prove a hostile work environment in violation of Title VII. *See Robinson*, 495 F. App'x at 141. Accordingly, OSC is entitled to summary

judgment on Clark's Title VII claims.

### 3.    FMLA

The State defendants argue that they are entitled to summary judgment on Clark's FMLA claims.  (Dkt. No. 145, Attach. 37 at 16-18.) Specifically, they contend that Clark cannot prove an inference of retaliatory intent, or, alternatively, that OSC has established non-discriminatory reasons for any alleged adverse employment action.  (*Id.* at 17-18.)  The court agrees.

FMLA retaliation claims are analyzed under the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004).  To establish a prima facie case of FMLA retaliation, a plaintiff must establish that:  (1) "[s]he exercised rights protected under the FMLA," (2) "[s]he was qualified for h[er] position," (3) "[s]he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Id.*

A presumption of retaliation is created if the plaintiff satisfies her initial burden, and the burden of production then shifts to the defendant to

state a legitimate, non-discriminatory reason for the adverse employment action.  *See Tomici v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 472, 490 (E.D.N.Y. 2012) (citing, *inter alia*, *Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir. 2001)).  "The employer's burden is merely one of production, not persuasion."  *Id.* (internal quotation marks and citations omitted).  If the defendant meets its burden of production, "the presumption of discrimination drops out" and the burden then shifts back to the plaintiff "to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination."  *Id.* (internal quotation marks and citations omitted).

Here, Clark went on approved FMLA leave from October 26, 2006 through December 3, 2006.  (State Defs.' SMF ¶ 20; Dkt. No. 145, Attach. 34 at 21.)  Clark claims that when she returned, many of her job duties, which included ordering and delivering folders, were eliminated.  (Dkt. No. 145, Attach. 34 at 51.)[19]  Additionally, on March 1, 2007, Clark was placed on involuntary leave pursuant to § 72.5 of the Civil Service Law.  (State Defs.' SMF ¶ 54.)  With respect to Clark's job duties, the State defendants

_____

[19] Clark also claims that, upon her return from FMLA leave, there was a lot of hostility toward her from her co-workers because she didn't have as much work to do as she did before she went on FMLA leave.  (Dkt. No. 145, Attach. 34 at 54-58.)

contend that Clark has failed to demonstrate an inference of a retaliatory intent because this new system was in place prior to Clark's FMLA leave. (Dkt. No. 145, Attach. 37 at 17-18.)  Clark, however, disputes that this new system was in place prior to her FMLA leave.  (Dkt. No. 189 at 24.)  With respect to Clark's involuntary leave, the State defendants further assert that Clark cannot establish an inference of retaliatory intent because there was nearly a three-month gap between her return from FMLA leave and her placement on involuntary leave, and, in any event, they have established non-discriminatory reasons for placing her on leave.  (Dkt. No. 145, Attach. 37 at 17-18.)

Assuming, without deciding, that Clark has met her *prima facie* burden,[20] the court is satisfied that the State defendants have established non-discriminatory reasons for the adverse employment actions, and that Clark has not proven pretext.  Indeed, with respect to Clark's job duties, Clark has only showed a temporal nexus between the adverse action and her FMLA leave, while the State defendants have offered a declaration

---

[20] The court notes that Clark's evidence in support of a *prima facie* case is weak at best. Her burden at this first step, however, is minimal. *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (noting that "the burden of proof that must be met to establish a *prima facie* case is minimal") (internal alterations and quotation marks omitted).

from one of her managers, Normile, that shows that OSC management was simply piloting a new system for ordering and delivering folders to the examiners. (Dkt. No. 145, Attach. 17 ¶ 19); *see Rosario v. Western Reg'l Off Track Betting*, No. 08-CV-6546T, 2013 WL 4094510, at *7 (W.D.N.Y. Aug. 13, 2013) ("[T]emporal proximity alone is insufficient to carry a plaintiff's burden of proof beyond the prima facie stage." (quoting *Meggison v. Paychex, Inc.*, 679 F. Supp. 2d 379, 390 (W.D.N.Y. 2010))). The State defendants also have shown that Clark's job duties were changed to keep her closer to her cubicle due to the documented hostility between Clark and some of her coworkers. (Dkt. No. 145, Attach. 17 ¶¶ 20-22.)

Similarly, the State defendants have shown that Clark was placed on involuntary leave because of her erratic and disruptive behavior, not because of her FMLA leave, from which Clark had returned three months prior to being placed on involuntary leave. (*Id.* ¶¶ 4-18); *see Rosario*, 2013 WL 4094510, at *7 (holding that, even if the plaintiff could state a *prima facie* case of unlawful retaliation, the defendant proffered legitimate, non-discriminatory reasons for termination, including the facts that coworkers complained about the plaintiff's behavior and the plaintiff's actions disrupted business operations). Accordingly, because the State

defendants have established non-discriminatory reasons for Clark's change in job duties and involuntary leave, they are entitled to summary judgment with respect to Clark's FMLA claims.

> ### 4.    Section 1983 Claims

The State defendants argue that Clark's § 1983 claims, alleging violations of her First and Fourteenth Amendment rights, must be dismissed.  (Dkt. No. 145, Attach. 37 at 18-20.)  The court agrees.

As an initial matter, the State defendants argue, and the court agrees, that to the extent that Clark attempts to assert § 1983 claims against OSC—an arm of the state—or the individual State defendants in their official capacities, such claims are barred by the Eleventh Amendment.  (*Id.* at 18-19); *see Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594-95 (2d Cir. 1990) (recognizing that § 1983 does not abrogate the states' Eleventh Amendment immunity); *Brown v. N.Y. State Dep't of Corr. Servs.*, 583 F. Supp. 2d 404, 411 (W.D.N.Y. 2008).  Accordingly, Clark's § 1983 claims against OSC and the individual State defendants in their official capacities are dismissed.

To the extent that Clark seeks to pursue § 1983 claims against the individual defendants in their individual capacities, such claims also fail.

First, with respect to Clark's Fourteenth Amendment due process claim, which is based on her involuntary leave and the subsequent § 72 hearing, (Compl. ¶ 188), there can be no due process violation "so long as the State provides a meaningful postdeprivation remedy." *Hellenic Am. Neighborhood Action Comm.* (*HANAC*) *v. City of N.Y.*, 101 F.3d 877, 880 (2d Cir. 1996) (citation omitted). In New York State, C.P.L.R. article 78 proceedings provide an avenue of postdeprivation redress that satisfies due process requirements. *See Vargas v. City of N.Y.*, 377 F.3d 200, 208 (2d Cir. 2004) ("[A]n Article 78 proceeding . . . provides a meaningful remedy where violations of due process by a . . . governmental entity are alleged." (citation omitted)); *HANAC*, 101 F.3d at 881 ("An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that [s]he could in a § 1983 suit." (citation omitted)). "[I]t matters not whether a plaintiff actually avails [her]self of the state court post-deprivation process. So long as that process is available, a due process claim must be dismissed." *Longo v. Suffolk Cnty. Police Dep't*, 429 F. Supp. 2d 553, 560 (E.D.N.Y. 2006) (citations omitted).

Although Clark now claims that she "demanded . . . an Article 78

[proceeding],'" (Dkt. No. 189 at 16), the court has already found that Clark "failed, without legitimate exception, to pursue an Article 78 proceeding." *Clark*, 798 F. Supp. 2d at 401. In that case, the court noted that Clark admitted that she never availed herself of Article 78's auspices, but asserted that "an [A]rticle 78 appeal would be futile as [her] constitutional rights have been violated and her property was taken away with[out] the due process of law," that "[a]n Article 78 would be an action in futility," and that she "is not required to pursue any remedies she believes are ineffective." *Id.* (internal quotation marks and citations omitted). As this court has already concluded, "Clark's bald, conclusory assertions of futility do not excuse her failure to exhaust State remedies." *Id.* at 402. Thus, Clark's due process claims against the individual State defendants must also be dismissed.

Next, with respect to Clark's First Amendment claim, though difficult to comprehend, the court is satisfied that Clark has failed, in any of her submissions, to explain how any of the State defendants violated her First Amendment rights. To prevail on her free exercise claim, Clark must "show that a state action sufficiently burdened h[er] exercise of religion." *Genas v. State of N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 831 (2d Cir.

1996) (citing *Sherbert v. Verner*, 374 U.S. 398, 403 (1963)).  At a minimum, an employee must allege that the state action discriminated "against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 532 (1993).

Here, Clark alleges that, by "requiring [her] to undergo testing and examination which violates her religious beliefs in order to maintain her employment" violated her First Amendment rights.  (Compl. ¶ 185.)  She further claims that her "adherence to [her] religious beliefs, including Christian prayers, [her] being subjected to psychometric testing which violated [her] religious beliefs of confessing sins to anyone but God weighed against [her] during the proceedings."[21]  (*Id.* ¶ 156.)  After reviewing the record, Clark has not put forth any explanation regarding the substance of her religious beliefs or provided any evidence as to how any

---

[21] In her opposition, Clark contends that Wapner's examination "asked questions that violate her religious beliefs," and during the examination, Wapner "showed [her] pornographic pictures, wherein a woman was lying on a bed with her private body parts exposed, and a man standing next to a table with books on it." (Dkt. No. 189 at 36.)  Clark also claims that there "was a picture on the wall, and a round table with books on it," and that "Wapner violated Clark with these pictures that were later referred to a[s] the TAT test." (*Id.*)  Clark simply has failed to explain how the examination discriminated against her Christian religious beliefs.  Further, Clark consented to this examination by signing a consent form, which listed the type of test she would undergo.  (Dkt. No. 151, Attach. 8 at 2.)

of the defendants' conduct burdened her exercise of religion.  Importantly,

Clark fails to proffer any basis from which to infer that any of the

defendants discriminated against her based on her or their religious

beliefs.  Accordingly, Clark's First Amendment claims are also dismissed.

## B.    <u>Union Defendants</u>

Clark also asserted ADA, ADEA, Title VII, and NYSHRL claims

against the Union defendants.  (Compl. ¶ 1.)  Additionally, Clark purports to

assert § 1983 claims against the Union defendants for violation of her First

and Fourteenth Amendment rights.  (*Id.*)

### 1.    *ADA, ADEA, and Title VII*

Among other things, the Union defendants contend that Clark's ADA,

ADEA, and Title VII claims must be dismissed because Clark failed to

demonstrate a discriminatory motive.  (Dkt. No. 141, Attach. 7 at 9-12.)

The court agrees.

Discrimination by unions is prohibited by Title VII, which makes it "an

unlawful employment practice for a labor organization . . . to exclude or to

expel from its membership, or otherwise to discriminate against, any

individual because of his race, color, religion, sex, or national origin."  42

U.S.C. § 2000e–2(c)(1); *see Yerdon v. Henry*, 91 F.3d 370, 375 (2d Cir.

28

1996) (finding that a labor union could be liable under Title VII).  A Title VII claim brought against a union, however, is evaluated differently than such a claim against an employer.  To succeed on her claim, Clark first must show that "the union breached its duty of fair representation to [her]." *Oparji v. United Fed'n of Teachers*, 418 F. Supp. 2d 139, 147 (E.D.N.Y. 2006).  A union breaches its duty of fair representation when (a) "its conduct toward a member . . . is arbitrary, discriminatory, or in bad faith," *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998), and (b) the alleged misconduct injures the plaintiff, *Spellacy v. Airline Pilots Assoc.-Int'l*, 156 F.3d 120, 130 (2d Cir. 1998).  If Clark establishes a breach of the duty of fair representation, she then "must show some indication that the union's actions were motivated by unlawful discrimination or retaliation."  *Oparji*, 418 F. Supp. 2d at 146.  The analysis is virtually the same for alleged violations of the ADA and ADEA.  *See Gerena v. Local 670 Stationary Eng'rs & Bldg. Servs. Union*, No. 12-Civ-7484, 2013 WL 3486976, at *4 (S.D.N.Y. July 10, 2013); *Kazolias v. IBEW LU 363*, No. 09 Civ. 7222, 2012 WL 6641533, at *28 (S.D.N.Y. Dec. 11, 2012)*.

Here, even if the court assumes, without deciding, that the Union

defendants breached their duty of fair representation, Clark has failed to prove that they acted with a discriminatory motive. First, with respect to her Title VII and ADEA claim, while Clark conclusorily alleges that she was discriminated against with respect to her religion, sex, age, national origin and ethnicity, (Compl. ¶¶ 184, 191), she has come forth with absolutely no evidence to suggest that the Union defendants discriminated against her on any of these bases. Moreover, the complaint itself is devoid of any factual allegations elucidating how the Union defendants discriminated against Clark on any of these bases.

Further, with respect to Clark's ADA claim, while Clark alleges that "CSEA stated that until I can proof that I no longer have PTSD, they will not represent me," (Compl. ¶ 28), that she was "harassed . . . because [she is] a person with disabilities," (*id.* ¶ 80), and that CSEA "refused to represent [her] based upon [her] . . . reasonable accommodation requests," (*id.* ¶¶ 131-33), she has again come forth with no evidence supporting these allegations. Indeed, with respect to Clark's reasonable accommodation requests, as discussed above, *see supra* Part II.A.1, all of her requests were either addressed by OSC or abandoned by Clark.

Accordingly, because Clark has failed to establish a discriminatory

motive, her Title VII, ADA, and ADEA claims against the Union defendants are dismissed.

    2.    *Section 1983 Claims*

The Union defendants next argue that Clark's § 1983 claims must be dismissed. (Dkt. No. 141, Attach. 7 at 17.) Specifically, they contend that CSEA is not a "person" under § 1983 and, therefore, is not amenable to suit. *Id.* The court agrees.

It is axiomatic that, in order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege: "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state . . . law." *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (internal quotations omitted); *see Pflaum v. Town of Stuyvesant*, No. 1:11-CV-0335, 2014 WL 295759, at *5 (N.D.N.Y. Jan. 27, 2014). In affirming a lower court decision, the Second Circuit has agreed that the "[CSEA] is not a 'person' as is required for suits brought pursuant to § 1983." *Rivas v. N.Y. State Lottery*, 53 F. App'x 176, 177 (2d Cir. 2002) (citing *Fitzpatrick v. Wert*, 432 F. Supp. 601, 602 (W.D.N.Y. 1977) and *Monell v. Dep't of Soc. Servs.*, 532 F.2d 259, 262-63 (2d Cir. 1996)). Accordingly, Clark's § 1983 claims

31

against CSEA are dismissed.[22]

## C.   **Wapner**

The only claims remaining against Wapner are Clark's § 1983 claims for violation of her First, Fourth, and Fourteenth Amendment Rights.[23] (Compl. ¶¶ 1, 185-87,188; Dkt. No. 53 at 6-7.)  Wapner contends that he is entitled to summary judgment on all of Clark's claims.  (Dkt. No. 152.) Specifically, he argues, and the court agrees, that each of Clark's claims fail on their merits.  (*Id.* at 9-13.)

First, for the reasons discussed above, *see supra* Part IV.A.4, Clark's First and Fourteenth Amendment claims fail.  Second, with respect to her

_____

[22] To the extent that Clark asserts § 1983 claims against the individual CSEA defendants, Unser, Lawyer, and Donahue, alleging violations of her First and Fourteenth Amendment rights, the court concludes that these claims also fail for the reasons articulated above, *see supra* Part IV.A.4.

[23] In his memorandum of law, Wapner notes that Clark appears to have alleged some type of conspiracy claim, by which Wapner received "11.52 years of service credit that he did not pay for and was not entitled to, to keep [Clark] out of work."  (Compl. ¶ 146; Dkt. No. 152 at 7-9.)  This claim is unavailing.  In order to prove a § 1983 conspiracy claim, a plaintiff must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).  Presumably, the alleged agreement between Wapner and OSC is demonstrated by Wapner being granted 11.52 years of service credit.  (Dkt. No. 189 at 35-36.)  Clark, however, has submitted no evidence to show that Wapner was awarded pension credits as a result of finding Clark unfit to work.  Instead, Wapner has submitted evidence demonstrating that the credits were awarded to him on the date of his retirement—three years prior to Wapner's examination of Clark—and that he ceased accruing pension credits in 1994, thirteen years before his examination of Clark.  (Dkt. No. 151, Attach. 7 at 2.)  Accordingly, because there is no evidence of an agreement between Wapner and OSC to deprive Clark of a constitutional right, Clark's conspiracy claim is dismissed.

Fourth Amendment claim, Clark alleges that Wapner's psychological examination "subjected [her] to unlawful search and seizure" and constituted a "violent intrusion of [her] body and mind." (Compl. ¶¶ 128, 155; Dkt. No. 189 at 32.) The court is unaware of any cases in this Circuit that discuss whether a psychological examination is an unreasonable search and seizure under the Fourth Amendment. However, the Seventh Circuit has held that a psychological examination was not an unreasonable search and seizure when an employee of the Indiana Department of Corrections was told that, in order to keep her job, she would have to submit to a psychological examination. *See Greenawalt v. Indiana Dep't of Corr.*, 397 F.3d 587, 590 (7th Cir. 2005) (Posner, J.) ("[W]e do not think that the Fourth Amendment should be interpreted to reach the putting of questions to a person, even when the questions are skillfully designed to elicit what most people would regard as highly personal private information.") The court is persuaded by Judge Posner's analysis in *Greenawalt*, and accordingly, holds that Clark was not subjected to an unreasonable search or seizure. *See also Coleman v. Dist. of Columbia*, 828 F. Supp. 2d 87, 93 (D.D.C. 2011). Thus, Clark's Fourth Amendment claim is also dismissed.

## D.    State Law Claims

Clark's only remaining claims are her NYSHRL claims against the State and Union defendants.  (Compl. ¶¶ 1, 189-90.)  Having dismissed all of Clark's federal claims, however, the court declines to exercise supplemental jurisdiction over the state law claims.  "In the absence of original federal jurisdiction, the decision of whether to exercise jurisdiction over pendent state law claims is within the court's discretion."  *Butler v. LaBarge*, No. 9:09-CV-1106, 2010 WL 3907258, at *3 (N.D.N.Y. Sept. 30, 2010) (citing *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 121-22 (2d Cir. 2006)).  When all federal claims have been eliminated before trial, the balance of factors in deciding whether to exercise jurisdiction over remaining state law claims leans toward dismissal.  *Kolari*, 455 F.3d at 122.  Accordingly, the court declines jurisdiction over any state law claims.

## E.    Motion For Sanctions

After the Union defendants filed their motion for summary judgment, Clark filed two nearly identical motions requesting that the Union defendants be sanctioned pursuant to Local Rule 8.1 for filing various exhibits, which Clark claims violate her privacy.  (Dkt. Nos. 142, 143.)  Although it is unclear to which exhibits Clark objects, she does appear to

object to the Union defendants' submission of certain medical records and employment history.  (Dkt. No. 143 at 2.)  The Union defendants responded and stated that, in accordance with N.D.N.Y. L.R. 8.1, they took care to redact certain documents and that Clark's medical conditions have been put squarely in issue.  (Dkt. No. 144 at 1.)  Although the court has discretion to sanction parties for violating the local rules, *see* N.D.N.Y. L.R. 1.1(d); *Morales v. N.Y. State Dep't of Labor*, 865 F. Supp. 2d 220, 256-57 (N.D.N.Y. 2012), the court has reviewed the Union defendants' submissions and finds no basis on which to impose sanctions. Accordingly, Clark's motions for sanctions, (Dkt. Nos. 142, 143), are denied.

## F.    Amendment

Upon a thorough review of Clark's response, it appears that she also requests leave to amend her complaint.  (Dkt. No. 189 at 42.)

Where a scheduling order has been entered, as there has here, (Dkt. No. 59), the lenient standard under Fed. R. Civ. P. 15(a), which provides that leave to amend "shall be freely given," must be balanced against the requirement under Rule 16(b) that the court's scheduling order "shall not be modified except upon a showing of good cause," Fed. R. Civ. P. 16(b).

*See Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003). "[A] finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (citations omitted).

Here, a uniform pretrial scheduling order was entered in this case on November 17, 2010. (Dkt. No. 59.) Although the scheduling order was amended several times throughout the course of this litigation, (Dkt. Nos. 69, 73, 78, 103, 105, 130), the original January 9, 2011 deadline for amendment of pleadings was never altered. At this point—over three years after the initial scheduling order was entered and nearly one year after the last amendment to the scheduling order was made—Clark's hollow request to amend her complaint is denied, as she has failed to show good cause. Furthermore, permitting Clark to amend at this very late stage in the litigation—after the close of discovery, the filing of two sets of dispositive motions, (Dkt. Nos. 26, 30, 36, 105, 141, 145, 151), and over four years of tortured litigation—would result in substantial prejudice to defendants. *See Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (noting that, regarding the Fed. R. Civ. P. 15(a)(2) standard, "[a] motion to amend should be denied only for such reasons as undue

delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." (internal quotation marks and citation omitted)).  Accordingly, Clark's request to amend her complaint is denied.

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the Union defendants' motion for summary judgment (Dkt. No. 141) is **GRANTED**; and it is further

**ORDERED** that the State defendants' motion for summary judgment (Dkt. No. 145) is **GRANTED**; and it is further

**ORDERED** that Wapner's motion for summary judgment (Dkt. No. 151) is **GRANTED**; and it is further

**ORDERED** that Clark's complaint (Dkt. No. 1.) is **DISMISSED**; and it is further

**ORDERED** that Clark's motions for sanctions (Dkt. Nos. 142, 143) are **DENIED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties by regular and certified mail.

**IT IS SO ORDERED.**

March 3, 2014
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court